Filed 10/14/25  In re G.L. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FIVE

| | |
|---|---|
| In re G.L., a Person Coming Under the Juvenile Court Law. | B339654 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff,<br><br>        v.<br><br>J.U.,<br><br>        Defendant and Appellant;<br><br>G.L.,<br><br>        Respondent. | (Los Angeles County Super. Ct. No. 22CCJP04792B) |

APPEAL from an order of the Superior Court of Los Angeles County, Juan M. Valles, Temporary Judge.  Affirmed.

John Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Aida Aslanian, under appointment by the Court of Appeal, for Respondent.

Mother appeals from an order terminating dependency jurisdiction under Welfare and Institutions Code section 362.4[1] and granting sole legal custody of G.L. (daughter) to father.[2] Mother contends that because the Department of Children and Family Services (Department) had recommended joint legal custody, and the court had previously ordered mother and father to share joint physical and legal custody of E.L.-M. (son), the court abused its discretion when it granted father sole legal custody of daughter. Respondent daughter contends the juvenile court's custody order was within the bounds of its discretion. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Dependency Investigation and Adjudication

The family came to the attention of the Department in October 2022, when both children were living with mother, and there was no family law custody order in place. The Department received a referral due to son's violent and aggressive behavior at school. The Department's detention report summarizes the social worker's investigation and concerns about mother's ability to care for and supervise son, who likely had an autism diagnosis and was repeatedly physically aggressive with mother and his

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father has not appealed.

teachers.  During the Department's initial investigation, son was evaluated by the county psychiatric mobile response team three times and hospitalized twice.  In early November 2022, when son was 7 years old and daughter was 6 years old, son physically attacked mother and mother's case manager, and after they de-escalated the situation, son re-escalated and threw daughter onto the ground, slamming her head on the floor.

After mother failed to comply with the terms of a voluntary family maintenance agreement, the Department obtained a warrant and placed son with father on December 7, 2022. Daughter remained with mother, because there were no concerns about mother's ability to supervise and care for daughter, separate from protecting daughter from son's violent behavior. The Department filed a dependency petition alleging, under section 300, subdivisions (b) and (j), that both son and daughter were at risk of harm based on mother's inability to provide son with appropriate parental care and supervision.

The Department's February 2023 jurisdiction and disposition report summarized that son lived with father during the week, but was also bonded to mother and stayed with mother on weekends.  Based on the juvenile court's order that daughter not be present during son's unmonitored visits with mother, daughter stayed with mother during the week and with father on weekends.  According to father, with assistance and guidance from the wraparound team, son's behavior had improved dramatically.  Mother reported that son continued to hit mother and act out when he stayed with her, and she asked for the wraparound team to provide her with the type of support that father was receiving.  The Department had previously noted that

3

mother had access to intensive support services but neglected to take the necessary steps to access them to help her care for son.

At a jurisdiction and disposition hearing in February 2023, the juvenile court sustained amended allegations under section 300, subdivisions (b) and (j), that both children were at risk of harm based on mother's inability "to provide [son] with appropriate parental care and supervision due to her failure to ensure the child receives appropriate medical and therapy, care, which without services the child acts out in the home, including violent, aggressive conduct towards the mother and [daughter]." Based on father's statements about difficulties getting son back into a routine after visits with mother, the court tentatively planned to order mother's visits with son to be monitored. Based on the court's tentative ruling, mother asked to set the disposition for a contest.

No visits took place during the interim period between the adjudication and disposition hearings. Father reported that mother was raising financial disputes with him that prevented an exchange of children, and mother reported visits had not taken place either because daughter refused or due to bad weather. Father reported he resolved the dispute by giving mother money. No concerns were raised regarding mother's ability to care for daughter, but the social worker noted that mother's comments were focused on raising complaints about father, including financial matters and accusing father of drinking.

At the disposition hearing in March 2023, the court ordered the current custody arrangement to remain in place as a home of parents placement order. Mother's case plan included a parenting program for special needs children, a family

4

preservation program, participating in wraparound services for son, individual counseling to address case issues, and protective parenting, plus conjoint counseling when recommended by son's therapist. The court denied the Department's request for father to participate in parenting and individual counseling, but ordered father to continue participating in wraparound services for son, and conjoint counseling if recommended by the therapist.

## B.    First Review Period

Mother was participating in individual counseling, and her clinician reported that mother's mental health symptoms had led to impairments in functioning with her housing, employment, education, and interpersonal relationships. Both the social worker and mother's counselor observed that mother had disorganized thoughts and challenges with comprehension, particularly on subject matters related to her children, raising serious concerns about her ability to parent daughter and son. For example, mother was not able to understand the importance of spending time with daughter. Mother participated in a program that provided mother with 52 hours of free childcare per week. The babysitter was a friend of mother's, who reported she would pick daughter up from school and bring her home at 8 p.m. on weekdays. Until recently, she would also babysit daughter from 11 a.m. until 8 p.m. on weekends. When the social worker and mother's counselor were trying to make mother understand the value of mother spending more time with daughter, mother's response was that if the program gave her the hours for childcare, she was going to use them. Mother reported she had a hard time understanding things, but also told the social worker

she knew how to get free things just sitting at home and putting on a show.

Daughter missed 48 days of school and was tardy 62 times during the 2022-2023 school year, and she had already missed 5 days of school in the fall of 2023, following a pattern similar to son's when he was in mother's care. Mother did not seem to understand the importance of daughter attending school every day and lacked a clear understanding of the correlation between absences and school performance, and of the differing roles and responsibilities of a parent and child, instead blaming daughter for not wanting to go to school.

Daughter was enrolled in individual counseling, but her attendance, participation, cooperativeness, and prognosis were rated as poor. Mother cancelled and rescheduled daughter's counseling sessions 20 times. Daughter was discharged from services for missing more than 3 weeks of sessions in a row.

In March 2023, mother enrolled in parenting classes at one organization, but by April, she was not able to remember the name of the organization. In May, she informed the social worker she was no longer attending classes, and the social worker provided her with new referrals. In June, mother reported she planned to enroll in a six-week parenting course at a different organization and was waiting to hear back from the organization. The organization confirmed to the social worker that mother had enrolled in an online course scheduled to start on July 26, 2023, but in September 2023, mother reported she did not attend the class because she was not comfortable with remote classes. Ultimately, by mid-September, mother had completed only 6 of 14 classes at the first organization.

By early August 2023, the social worker referred daughter to wraparound services, more intensive services to address her behaviors that include not wanting to go to school, defiance, and disrespect towards mother. Wraparound services could also provide a different support system for mother, including one-on-one support and team support. By the time of the Department's report, daughter's wraparound services had just started, and the team was just beginning to build rapport with the family. Mother had agreed to services and appeared to be cooperative with the team. The social worker considered daughter to be at high risk of harm if left in mother's care, but thought that six months of intensive services would help mother address daughter's behaviors and give mother the knowledge and support to make changes and provide better parenting for daughter.

Son's wraparound facilitator reported that mother had not participated in son's wraparound services, despite being invited to participate in January and February 2023. Both mother and son enjoyed their unmonitored weekend visits, and son asked if he could return to mother. The social worker observed one custody exchange, when mother returned son to father's custody. While both parents were cordial with each other and communicated appropriately, son became aggressive and was rude towards his mother over his toys. Son was also rude to the social worker and would not listen when he was asked to sit down. Rather than responding or correcting son's behavior, mother told the social worker she could not believe son was behaving like that after she took him to eat at every restaurant he wanted and bought him all the junk food he asked for. In contrast, father intervened with a stern correction and a renewed

request for son to sit down, and son listened to father and sat down.

The Department recommended terminating jurisdiction over son, with parents sharing joint physical and legal custody, and father having primary physical custody. It also recommended continuing jurisdiction over daughter with family maintenance services and that the court order a mental health evaluation of mother under Evidence Code section 730.

Mother continued to make worrisome statements in October and November 2023, and daughter's behavioral problems continued. At a child and family team meeting, mother reported daughter would have temper tantrums, throw herself on the sofa, and hit mother. Mother spoke negatively about father in front of daughter without seeming to understand the negative impact she was having on daughter. Mother also made statements like "I lives in lies now, I use to live in the truth and reality but not anymore."

In November 2023, mother reported she had falsely told an SSI worker that she had not bathed in 20 days, just to receive additional services from SSI.[3] Mother's therapist raised concerns that mother left daughter in the care of a neighbor who allowed daughter to go to the playground unattended. The following

---

[3] The Department's reports do not define "SSI," but we understand it to be a reference to a federal program named Supplemental Security Income. According to a "frequently asked questions" page for the Social Security Administration, "SSI provides payments to people with limited income and resources who are age 65 or older, blind, or have a qualifying disability." (<https://www.ssa.gov/faqs/en/questions/KA-02274.html, [as of Sept. 25, 2025], archived at <https://perma.cc/25HP-BVD2>.)

8

week, mother spoke aggressively to the therapist, complaining that she did not like people getting in her business, they were stressing her out, and that wraparound told her they were going to steal daughter from her. When the therapist tried to explain that mother had misread the situation, mother changed the subject. Mother also told the therapist she had purchased a one-way ticket to El Salvador, was planning to leave daughter with maternal grandmother and then send for daughter when the case was over.

Between August and November 2023, daughter was in first grade and had 9 absences and 23 tardies. Daughter reported that mother did daughter's homework for her, and when the social worker discussed the matter with mother, mother found it amusing and laughed it off.

The Department continued to recommend terminating jurisdiction over son, but continuing jurisdiction over daughter with family maintenance services and a mental health evaluation of mother.

At the review hearing in December 2023, minor's counsel for son stated he joined the Department's recommendation to terminate jurisdiction with joint physical and legal custody over son, with father having primary physical custody, but asked the court to keep the current legal custody arrangement in place and to give father tie-breaking authority. Son's attorney pointed out that mother had not gained insight or participated in services, but that son was only with mother on weekends, so father had taken primary responsibility for ensuring son received services.[4]

_____

[4] We grant appellant's June 11, 2025 Request for Judicial Notice of the juvenile court's December 13, 2023 custody order and final judgment regarding son E.L.-M., which provides for

9

Concerning mother's care of daughter, the court declined to order a mental health evaluation of mother, but found it would be detrimental to allow daughter to remain in mother's care during the week.  While the court did not remove daughter from mother's custody, the court did change its placement order from home of parents to home of father, with mother having unmonitored weekend visits.  The court noted the importance of daughter being in a safe environment where one parent does not speak negatively about the other parent in the child's presence, and stated that if mother's conduct changed in the next six months, it would revisit its decision at that point.  The court added that if there was no progress in the next six months, it planned to make its temporary home of father order a permanent one.

## C.    Second Review Period

By the time the Department submitted its June 2024 status report, mother had completed all of her services, but continued to exhibit an inability to focus on developing the skills necessary to effectively parent either child.

Father had met all of daughter's physical, medical, and emotional needs, providing her with structure and a supportive home environment, participating in her annual individualized education plan (IEP) meeting, ensuring she was attending school and participating in wraparound services and therapy to address her behaviors.  Father was an active participant in wraparound

---

joint legal and physical custody of son to mother and father, with primary residence with father.

services, as well as in meetings and sessions with the parent partner. In contrast, mother continued to exhibit disorganized thoughts and challenges with comprehension. During a child and family team meeting with the wraparound team in March 2024, mother had trouble following the rules of the meeting and continued to speak negatively about father; mother's therapist had to continually redirect mother and re-explain the rules to her. Mother also made random statements when speaking with the social worker, or focused on her own trauma, and mother repeatedly sent the social worker bizarre texts with attachments unrelated to case issues.

Daughter felt safe with both mother and father and loved both of them. Daughter reported that son would sometimes call her inappropriate names when they were both staying with mother over the weekend. Father reported that daughter's negative behaviors with mother occurred because mother would allow it, and he did not have issues with daughter exhibiting negative behaviors. He said he was always talking to daughter about respecting mother, and mother knows she can call him to help with any behavior problems.

The Department recommended terminating the dependency case and ordering joint physical and legal custody of daughter to both parents, with father having primary physical custody.

**D.     June 2024 Status Review Hearing and Exit Order**

At the June 2024 review hearing, after the Department noted its recommendation for terminating daughter's case with a custody order giving mother and father joint legal and physical

custody over daughter, daughter's counsel asked the court to enter an order giving father sole physical and legal custody over daughter, noting mother's ongoing struggles with mental health and her inability to meaningfully participate in meetings concerning daughter. Daughter's counsel argued that joint legal custody would be unworkable and too much of a burden on father, as it would be extremely difficult for father to consult with mother. Mother did not appear able to respond in a meaningful way and there was no indication father would make any decisions that were not in daughter's best interests. Father's counsel joined in the request for sole physical and legal custody with the same custody arrangement already in place. Mother's attorney noted that mother was seeking sole physical and legal custody, and also pointed out that there was evidence that mother and father were able to communicate effectively regarding daughter's needs, particularly concerning her difficulties with son. Emphasizing the bond between mother and daughter, and the fact that mother was able to provide for daughter, counsel asked the court to keep those facts in mind and enter an appropriate custody order. The court expressed a high degree of concern with mother's ongoing disorganized and bizarre thinking and behavior, concluding it would preclude parents from making joint decisions about daughter's well-being. Relying on the recitation of facts and law stated by minor's counsel, the court found it to be in daughter's best interests to award father sole legal and physical custody, with mother continuing to have unmonitored visits. The custody order was filed on June 20, 2024.

## DISCUSSION

### A. Legal Principles

"Section 362.4 governs the termination of juvenile court jurisdiction and related orders." (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*).)  "The statute authorizes a juvenile court to make 'exit orders' regarding custody and visitation upon terminating dependency jurisdiction over a child." (*Ibid.*; *In re Chantal S.* (1996) 13 Cal.4th 196, 202–203.)  "These exit orders remain in effect until modified or terminated by a subsequent order of the superior court." (*J.M.*, *supra*, 89 Cal.App.5th at p. 112, citing § 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)

" '[I]n making exit orders, the juvenile court must look at the best interests of the child.' " (*J.M.*, *supra*, 89 Cal.App.5th at p. 112.)  "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child." (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 201.)  "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . .  Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' [Citation.]" (*J.M.*, *supra*, 89 Cal.App.5th at p. 112.)  "[A] finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in

the child's best interests for a variety of reasons." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.)

When it makes exit orders, the juvenile court has broad discretion to decide custody matters, and we review the orders for an abuse of discretion. (*J.M., supra*, 89 Cal.App.5th at pp. 112–113.) We do not disturb the court's order unless appellant demonstrates that it exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [reviewing court cannot substitute its decision for that of the trial court when the facts can support more than one reasonable inference]; *In re N.M.* (2023) 88 Cal.App.5th 1090, 1094.)

## B.    Analysis

Mother does not contend that the court erred in granting father sole physical custody of daughter, with unmonitored visits for mother. Instead, she only challenges the court's order giving father sole legal custody, focusing her argument on the purportedly inadequate reasons for making that order. The court adopted the reasoning proffered by daughter's counsel and father's counsel, that mother's bizarre statements and challenging behaviors could cause difficulties for joint decisionmaking regarding daughter's education or medical treatment. Regardless of the court's stated reasoning, mother has not shown the order exceeded the bounds of reason. Her argument on appeal is nothing more than an argument that we should weigh the evidence anew, and substitute our judgment for that of the juvenile court, which we may not do.

In her opening brief, mother cites inapt authorities to argue that minor's counsel and father's counsel bore the burden of proof

to convince the court that a sole custody order was warranted, and they failed to do so. Mother's argument also highlights father's willingness to serve as a resource to assist mother if she had difficulties with daughter's behavior. Ultimately, father's willingness to work with mother does not overcome the record evidence of mother's inability to meaningfully participate in decisionmaking about daughter's educational, medical, or emotional needs. While father was fully engaged in ensuring son and daughter were engaged with supportive services and attending school, mother's track record with schooling and wraparound services demonstrates that an order of joint legal custody would not be in daughter's best interests. On multiple occasions, mother demonstrated a singular focus on her own needs at daughter's expense. Mother kept daughter with a babysitter simply because a program gave her free babysitting time, used financial matters to preclude daughter's visits with father until he paid her, spoke negatively about father in front of daughter, did her daughter's homework, and lied to serve her own needs. When mother was asked about daughter's high number of absences and tardies at school, mother simply said that daughter did not want to go to school. Mother was unable to ensure daughter attended therapy regularly. When daughter started exhibiting defiance and signs of manipulating mother, the social worker initiated wraparound services, and mother was initially cooperative. However, mother later accused the wraparound team of trying to steal daughter from her, and made plans to fly to El Salvador and send for daughter later. These facts provide ample basis for the juvenile court to have exercised its discretion to grant minor's request to give father sole legal custody.

To the extent mother contends it was error for the juvenile court to award father sole legal custody because circumstances had not changed from six months earlier, when the court granted mother and father joint legal and physical custody of son, no relevant legal authorities support mother's argument that the juvenile court was under any obligation to make its earlier order concerning son's custody and visitation equally applicable to daughter. A court's custody and visitation orders consider what is in the best interests of a particular child in light of the totality of the circumstances. (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 201.) The circumstances surrounding son and daughter were different through the full course of this dependency case. When the Department began its investigation, it had no concerns with mother's ability to care for daughter, and there were no signs of any issues beyond mother's inability to protect daughter from son's anger and violence. However, during the first review period, daughter's behavior deteriorated to the point that the Department started wraparound services for daughter and expressed concerns about risk of harm to daughter. At the December 2023 hearing, the court advised mother that if things did not improve, it was inclined to keep daughter with father. Son and daughter are different children with different needs and circumstances, and through their counsel, they argued that different exit orders served their best interests. When the juvenile court terminated dependency jurisdiction over son, no objection was raised to the Department's recommendation for joint legal and physical custody. In contrast, while the Department still recommended joint legal and physical custody over daughter, daughter's attorney argued to the court that an

16

order giving father sole legal custody would better serve daughter's interest, and father's counsel joined in that argument.

On the record before us, mother has not persuaded us that the juvenile court's order granting father sole legal custody over daughter was an abuse of discretion.

## DISPOSITION

The juvenile court's June 20, 2024 custody order is affirmed.

NOT TO BE PUBLISHED.

MOOR, J.

WE CONCUR:

HOFFSTADT, P. J.

KIM (D.), J.

17